## CROSSINGS OF ELECTRIC AND STEAM RAILWAYS.

Circuit Court of Huron County.

AKRON & CHICAGO JUNCTION RAILROAD COMPANY v. SANDUSKY, NORWALK & MANSFIELD ELECTRIC RAILWAY COMPANY.

Decided, 1906.

*Railroad Crossings—Policy of the Law with Reference to—When an Overhead Crossing Will be Ordered—Apportionment Between Electric and Steam Railways of Cost of an Overhead Crossing.*

1. It is the policy of the statutes providing for the manner of one railroad crossing another to require crossing other than at grade, where practicable from an engineering point of view and reasonable as a business proposition; and where an electric road seeks to cross a steam road and an overhead crossing is, under all the circumstances, practicable and reasonable for both companies, a crossing of that character will be ordered.

2. In apportioning the cost of an overhead crossing between an electric railroad company and a steam railroad company, the steam company where first established, should be made to share the cost of constructing only that part of the crossing that is necessary to provide a way and support for the tracks of the crossing railroad; the cost of ties, rails, ballast and the like must all be borne by the company crossing the older line.

*Arrel, Wilson & Harrington, R. G. Craig* and *W. Severance,* for plaintiff.

*S. M. Young,* contra.

PARKER, J.; HAYNES, J., and WILDMAN, J., concur.

This matter comes into this court by way of appeal. An application was made to the court of common pleas by the Akron & Chicago Junction Railroad Company, under an act (97 O. L., 548; Revised Statutes, 3333-1; General Code, 8834), entitled "An act to amend Section 1, of an act entitled 'An act to provide for one steam railroad's crossing another steam railroad,' passed May 10, 1902, relating to the crossing of railroads" to require that the crossing over its railroad proposed and designed by the

Sandusky, Norwalk & Mansfield Electric Railway Co. should be made otherwise than at grade crossing.

From the order or judgment of the court of common pleas an appeal has been taken to this court, and we have heard the testimony of the witnesses pertaining to the reasonableness and practicability of the mode of crossing otherwise than at grade; we have also heard the arguments of counsel upon the matter and have also viewed the location of the proposed crossing.

It may be thought since we have arrived at a conclusion in the case very soon after the arguments were closed, that we may not have given the case as full consideration as it merits; but I may state to counsel and parties interested that we have had the matter under consideration ever since the case was opened to us and Judge Haynes and myself have had it somewhat under consideration ever since the matter was presented to us at chambers at Toledo, some time ago. We feel that we are about as well informed as to all the circumstances that should be taken into consideration as we would be if we should give the matter more extended consideration.

The railway company makes this application as the owner and operator of a steam railroad. At the point in question it has double tracks, and it appears from the testimony that it designs to have four tracks some time in the future; that the road is doing a great deal of business and that its business is rapidly increasing. Without doubt it is at the present time (saying nothing of the purpose for the future) a main trunk line, and at this point many trains are run over its road, some of them at a high rate of speed; this point lies not very near to any village, upon a straight piece of track and a high rate of speed may be attained.

On behalf of the company it is insisted that it would interfere materially with its traffic and with its operations if a grade crossing were established here, and that such a crossing would be likely to result in expense to it and in damage to the traveling public, both those traveling over its line of railroad and those traveling over the line of the electric railroad. It is proposed by the electric road to cross the steam road at this

point at right angles.   The electric road is now constructed over a distance of about twenty-five miles and it is designed to be extended.   It is said that its purpose, when it is fully constructed, when it has completed this crossing, is to run in the neighborhood of thirty cars per day.   It appears that the steam railroad runs from forty to sixty trains per day over its line of road at this point.

From this brief statement of facts, it will appear that this will be a very important crossing of the railroads, and one where we think that even if the greatest precautions were observed by all the parties operating upon either line, accidents would be very likely to occur.

In applying this statute and in construing it, we feel that we should have in mind and in force the evident legislative policy of the state, as manifested not only in this statute, but in a number of other statutes upon the statute books of the state *in pari materia;* and it is very plain that that policy is to avoid in the future, as far as reasonable and practicable the construction of additional grade crossings, and to do away with grade crossings that are at present in existence.

The statutes to which I refer, other than the one applicable to this case, are found in Revised Statutes, 3337-8 to 3337-17 (General Code, 8863-8873), and another statute of like character, Revised Statutes, 3337-17*a* to 3337-17*h* (General Code, 8874-8892), and the statute passed on April 25, 1904 (97 O. L., 546; Revised Statutes, 5332; General Code, 11605 *et seq.*), entitled ''An act to provide how railroad and highway crossings may be constructed.''

Under this statute applicable to this case, it devolves upon the court to ascertain, determine and define by its decree, the mode of crossing which will inflict the least possible injury upon the rights of the company owning and operating the road which is intended to be crossed and if, ''in the judgment of said court, or said judge, it is reasonable and practicable to avoid a grade crossing, it shall by its process, prevent a crossing at grade.''

It is obvious that the mode of crossing that would be the least injurious to the company making this application would be some other mode than a grade crossing; that a grade crossing, in other words, would be the most injurious mode of crossing to that company.

It is urged, however, that it does not necessarily follow that such crossing would interfere with absolute rights of the company; that the rights of the company to that part of its road not to have it crossed, are not of that high degree, or not of that character that should receive great consideration in opposition to the project and rights of the electric railroad company; that its right, in other words, to operate its line of railway over the country, is subject to the rights of the public as represented by other public service corporations to cross over its tracks.

We agree that the statute, in speaking of the rights of the company whose road may be crossed, has in view rights which are not absolute, but which are qualified in the manner already suggested by counsel.

We have to consider, under the evidence, whether another mode of crossing is practicable, and as we understand the testimony of the engineers, as an engineering proposition—as a physical question—the practicability of an overhead crossing at this point is beyond question. It may be done, and that, we think, is all that is intended by the word "practicability" in this statute. But, as we understand the statute, such a crossing is not to be required unless it is reasonable as well as practicable; so we have to consider the question of the reasonableness of such requirement.

It seems to us that the main question here is, whether as a business proposition it is reasonable to require this of the company, which has invested or which purposes to invest its money in this project. We have discussed this and we have taken into consideration in this connection the cost that would devolve upon the electric road of maintaining a grade crossing at this point.

It is clear from the evidence that the actual cost to the electric road of maintaining a grade crossing at this point would be

about $500 a year, certainly not much less, and perhaps not a great deal more than that. Taking that into consideration and taking the loss of power which has been testified would result from the starting or the stopping of cars and the starting of cars again, as they are required to do at grade crossings, the delays incident to such stoppages, and to observe whether trains are coming and to wait for trains, if they happen to be coming, and the possibility—to put it no stronger—of loss resulting from accidents from collisions at crossings, we think it would be reasonable, as a business proposition, for this electric railroad company to build an overhead crossing at this point, even if the whole expense of it should fall upon the electric company. ·

On the other hand, taking it from the point of view of the steam railroad, the slowing down that would be required in the operation of their trains, the breakages that would occur to wheels, as has been testified to, from the running over these frogs, the hindrances that would result when it became necessary to repair and replace the frogs, and the responsibility of the company for disastrous accidents, that would not be unlikely to occur and result in great loss to the railroad company, we think, as a business proposition, that this overhead crossing should be constructed, even though every dollar of cost should fall upon that company. Certainly then, we conclude that, if the cost is to be equitably divided so that the whole cost shall not fall upon either, as to both it is reasonable that this overhead construction should be made. Such a crossing should not be required, if the grade the electric company would be required to establish would exceed the maximum grade of the company crossing; and it is made clear by the evidence here that this would not be so; that this crossing may be made at a grade not to exceed 3 per cent. The electric railroad has grades upon its line exceeding 3 per cent.—grades that it has voluntarily established—and other grades running up to 6 per cent. and perhaps seven per cent.— at least 5 or 6 per cent.—where it is running over village streets upon grade established by the municipality. Neither should it be required, if it would result in the tracks being put below high watermark. It is clear from the evidence that that would

.iot result here; so that we see no hindrance by the intervention of anything provided for in the statute to the ordering of this overhead crossing. We have not discussed the matter of any other mode of crossing; that is to say, a crossing going under the steam railroad, because it seems to us that, if it is practicable at all, it is not so practicable as an overhead crossing.

The statute requires that the court shall, in its order, equitably apportion the initial expense of such construction or crossing, with the expense of maintenance thereof, among the parties interested.

Before coming to that, however, I should say something about another matter that is urged upon our attention, and that is, the probable results to the traveling public using the highway, the roadway being one of the principal highways of the county across this steam railroad at about the same point, also at right angles; in other words, the right-of-way of the electric railroad is immediately to the east of and parallel with the highway; and it is said that the construction of such an embankment as will be required here to carry the electric road over the steam road will result in so obstructing the view of persons traveling along the public highway—obstruct their view of the railroad to the east—as that it will endanger them and endanger trains; and vice versa, that it will obstruct the view of the enginemen upon trains to the east of the embankment—obstruct their view of the highway and of passengers thereon.

This is a matter worthy of consideration, to be taken into account, we think, under the head of the reasonableness of the requirement. But even then, we think the greatest good to the greatest number, the greatest interests involved, should be considered, and that so far as the public travel along the highway is concerned, we do not see but that this construction may be so made as to avoid the dangers apprehended by counsel; in other words, that the embankment need not be carried so far toward the right-of-way of the steam railroad as to prevent a fair view of the railroad to the east by persons along the public highway within a reasonable distance of the railroad, so that if there were any danger to be apprehended, they might observe it before

coming upon the railroad; and so that enginemen to the east of the embankment on trains passing westward might not have their view of the highway materially obstructed.

Our conclusion is, that an overhead construction should be required; but we are not prepared to set forth in a decree precisely what that overhead construction shall be. We think that the embankments and abutments should not be carried nearer than twenty-five feet of the right-of-way of the steam road; in other words, that there should be open spans covering the distance over the right-of-way, which is one hundred feet, and twenty-five feet beyond, on each side, which would make it one hundred and fifty feet. The central span should be sixty feet to admit of a four-track construction, if the steam railroad should so desire, so that it might be done without tearing down this construction or interfering with it. That would make necessary forty-five feet, I believe, in each of the other spans.

Just how those spans should be constructed, the weight of iron and the weight of steel, or the exact form of construction, we are not prepared to say—we are not prepared to set forth in a decree. We think that ought to be arrived at by agreement of the parties; that they ought to be able to come together upon the subject; if they are not able to do so, however, the court will take to its aid an engineer and have plans prepared, but that is an undertaking the court does not desire to enter upon, as it would be obliged to trust entirely to the judgment of engineers, and we think it would be better, if possible, to have it done by the parties interested.

We conclude, taking into consideration the advantages to result to each party, their rights in the premises as public service corporations, the interest of the public and all, that the cost should be divided as provided in like cases by the statutes; that is to say, that each party should bear one-half of the expense of this construction. This, however, is not to include the cost of ties, rails or ballast, or anything of that sort, and is not to include the cost of land for supporting the embankment or damages to abutting landowners. We think the electric railroad company should procure its own right-of-way; that what the

statute contemplates here, is the cost of construction of such crossing, not the cost of the right-of-way.

Now, unless the parties can agree upon the amount of the cost to be divided in this way, and upon the form of construction, the court will have to take to its aid, as before stated, an engineer and other competent persons to arrive at it, and then declare it.  We think they should also be able to relieve the court of the burden of determining the manner or time of payment; and unless it is done by the parties the court will have to do it.

In view of the fact that the cost of maintenance will be inconsiderable—will be very light indeed, as compared with the cost of maintaining a grade crossing by the electric road—we conclude that, if the steam road bears one-half of the initial cost, that should relieve it from any further burden with respect to this crossing; and we also conclude that the cost of this inquiry should be divided equally between the parties.

It should be understood that this decision at which we have arrived is not a settlement of the whole controversy which may arise between the parties; in other words, that it is subject to the rights of the steam railroad to deny a crossing to the electric railroad until they shall acquire their right by appropriation proceedings.  The Constitution requires that an appropriation of property shall be made and that the costs assessed by a jury shall be paid, before one may enter upon the property of another; and this statute, if it undertook to do away with that provision, would be, of course, unconstitutional.  But if such form of construction is made as we have described, and as we shall order, we think it proper to say now—what we may possibly be required to say some time in the future—that we can not see why the steam railroad should have more than nominal damages for the crossing.

We can not, as we understand the law, give the right for a temporary crossing; we can not give the right to any crossing; we can not give the electric railroad any right to cross overhead, underneath, or any way at all: we can only determine how they shall cross when they have acquired the right to cross.

We will hold the case open for a reasonable time to give the parties an opportunity to agree upon plans.

We think the control of the construction should be in the hands of the electric railroad company. It is their road; it will be their bridge, or their crossing.

Another matter that has occurred to us is, that it is a matter of indifference to the steam railroad what the grade of this bridge shall be, only so that the height required shall be attained. It may be, that the electric railroad company shall prefer to make the bridge more abrupt and not have the grade 3 per cent., but have it 4 or 5 per cent. In that case there would be less cost—less cost would fall upon them and less cost would fall upon the steam railroad. That, however, will be a matter for them to consider. The court would not require them to build it at a grade exceeding the 3 per cent.

We shall treat this as our final judgment and we shall have the journal speak as of today. If the parties do not agree, we shall get the information required of us in the best way we can, and use it. We do not understand that in cases of this kind, we are required to sit in court as upon a regular trial of an ordinary law or equity case. We might have proceeded in the case without calling a single witness if we had chosen to do so.

The restraining order will remain in present force. The order should be modified, however, if necessary, so as to allow the electric road to proceed in condemnation.